FILED
01 APR -2 PM 2:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| MILES PALMORE, | ) | |
| Plaintiff, | ) | |
| vs. | ) | CV-00-PT-2479-E |
| BOSTROM SEATING, INC., | ) | |
| Defendant. | ) | |

ENTERED
APR 2 2001

## MEMORANDUM OPINION

This cause comes to be heard upon defendant Bostrom Seating, Inc.'s ("defendant") Motion for Summary Judgment, filed on January 30, 2001. Plaintiff Miles Palmore ("plaintiff") brought this action against the defendant for disparate treatment, pursuant to 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*

## UNDISPUTED FACTS

The plaintiff is currently an employee of the defendant. He has worked for the defendant since April, 1975. It is undisputed that, before the events at issue in this case, the plaintiff performed his tasks satisfactorily and never received warnings or reprimands concerning his job performance.

For twenty-two years prior to this incident, the plaintiff had worked solely in the defendant's "Press Department." Prior to this incident, the plaintiff had been an hourly employee; he had never worked for the defendant in an official supervisory capacity. He also had never worked in the Sewing Department. However, at times, he had performed a quasi-

1



supervisory function called "group leader," or "team leader."

In 1997, the defendant posted a notice regarding the vacancy of the position of "Sewing Department Supervisor." The plaintiff and three other employees applied for the position. The plaintiff eventually was chosen. At a certain point in time that is disputed by the parties, the defendant changed the nature of the position from "Sewing Department Supervisor" to "Supervisor Trainee," a probationary position in which the Trainee's performance would be evaluated for a year before the Trainee became an actual Supervisor. The defendant has indicated that this new "Supervisor Trainee" concept was created especially for the plaintiff's situation, and is still in place. Jackson depo., p. 65.

For the first three months after the plaintiff became the Supervisor Trainee of the Sewing Department, his work evaluations were quite positive. On the plaintiff's three-month evaluation, his training supervisor, Wanda Dobbs, wrote: "[The plaintiff] is a very dedicated and loyal employee. When his supervisor training is completed, I feel that he would be a great asset to [the defendant's] management team." Defendant's exhibit D. After the first quarter of the plaintiff's training, however, the performance evaluations became negative. After the end of the training period, around January 21, 1999, the defendant notified the plaintiff that he would not receive the permanent supervisor position. The defendant returned the plaintiff to his former position and, after the plaintiff's health interfered with his job performance in that position, moved him to another position within the company that would better accommodate his physical limitations. After the plaintiff left the "supervisor trainee" position, he suffered no loss in pay. Plaintiff depo., p. 107.

## DISPUTED FACTS

The plaintiff alleges that the defendant decided to change the nature of the Sewing

2

Department position to that of "supervisor trainee" only after it had determined that the plaintiff was the most qualified. The defendant has attempted to dispute this asserted fact by arguing that the plaintiff knew, prior to accepting the position, that it was a "trainee" position. The defendant's argument does not answer the plaintiff's assertion. Regardless of whether the plaintiff knew that the position was a trainee position before he accepted it, or whether the news came as a complete surprise to him when he arrived at the Sewing Department, the plaintiff has argued, instead, that the defendant made its decision to turn the position into a trainee position only after it realized that he was the most qualified person for the job. This allegation finds direct support in the deposition of Wanda Donovan, the defendant's Human Resources Manager. In her deposition, Donovan stated that, when reviewing the qualifications of the employees who had bid for the position, she had found the plaintiff to be more qualified than the others because of his education, his good employment record, and his seniority in the company. Donovan depo., p. 38. However, between the time that Donovan determined that the plaintiff was the most qualified and the time that the plaintiff was offered the position, the defendant decided to make the position a training position. Donovan Affidavit, para. 10.[1]

Next, the plaintiff disputes that his qualifications were even slightly lacking. According to the plaintiff, the qualifications for a supervisory position were prior work experience in the department, prior experience as a supervisor, or prior experience as a team leader. The plaintiff cites to Donovan's deposition at page 39, in which she states that "[i]n the past, we had selected supervisors, or the supervisors had been selected kind of from their departments either because

---

[1] Of course, the defendant argues that the decision to make the Sewing Department Supervisor position a training position was based on the fact that none of the employees, including the plaintiff, had the supervisory experience that the defendant wanted. However, this explanation does not negate the fact that the decision was indeed made after it was determined that the plaintiff was the most qualified applicant for the job.

3

they had experience in their department or because they had been a team leader or because they had prior supervisory experience. . . ." The plaintiff argues that, because he had been a team leader prior to bidding for the promotion, the defendants did not need to put him in a training position; he already fit their qualifications for a direct promotion. Although both parties refer to the opening notice that the defendant displayed when it accepted bids for the position, and allude to the list of qualifications contained in the notice, neither party has either submitted the notice to this court nor recited the specific contents.

The defendant next disputes that the plaintiff is similarly situated with the individuals that he purports to use as comparators. The plaintiff has identified seven individuals who, he asserts, were similarly situated to him, but were promoted to full supervisory positions without first being trained: Jimmie Williams, Don West, Jeff Wilkins; J.P. Jones, Marty Lockridge, Jack Burnett, and Bob Wheeler. The defendant, through an affidavit of its Human Resources Manager, Wanda Donovan, has submitted evidence of the comparators' qualifications and employment histories.

> "Jimmie Williams was hired . . . on May 30, 1995 . . . . He began working as a tool and dye maker . . . and later was promoted to a lead person in that department . . . which is a department that works hand-in-hand with the press department. . . . . He was promoted to the position of supervisor in the press department on May 4, 1998.
>
> Don West was hired . . . on December 12, 1983 . . . . He began by working in the metals stores department, which required him to keep up with press and welding parts. Thereafter, he became a quality control inspector over the welding department and was promoted to . . . supervisor of the welding department on February 22, 1995.
>
> Jeff Wilkins was hired . . . on May 2, 1988. . . . He worked in the sewing department from January 3, 1994 . . . . he was promoted as supervisor of the sewing department [on February 13, 1995].
>
> J.P. Jones was hired . . . March 6, 1989 . . . . She transferred from [another of the

4

> defendant's facilities] to the Piedmont facility where she worked in the shipping department as a shipping coordinator. She was promoted in 1994 to supervisor of the shipping department.
>
> Marty Lockridge was hired . . . on May 17, 1976. He . . . work[ed] in the press department . . . then as a welder . . . . Thereafter, he became a quality inspector . . . . [a] layout technician in the quality department . . . . then . . . a quality technician, which is a salaried, non-exempt position. Thereafter, he became a quality engineer, which is an exempt position . . . . he now holds the position of quality manager."
>
> Jack Barnett was hired on February 8, 1999 . . . . as a supervisor for the cutting and sewing department from outside the facility. His prior supervisory experience consisted of being a supervisor at Fruit of the Loom for eight years.
>
> Bob wheeler was hired . . . on August 23, 1999 . . . . as supervisor of the sewing department; and . . . subsequently . . . as [a supervisor of the] final assembly. His prior supervisory experience consisted of one year of supervision at Mid South Electronics and nine years of supervision at Premix, Inc."

Donovan affidavit, p. 2-3.

Finally, to show evidence of the defendant's alleged discriminatory intent, the plaintiff alleges that he suffered two specific "racial incidents," the occurrence of which the defendant flatly denies.[2] The first incident involved the alleged statement, by one of the co-workers in the plaintiff's department, that "I'm not going to work for no [sic] nigger." The plaintiff claims that Debra Matthews, one of the employees that he supervised in the sewing department, made the alleged racially derogatory statement, but was not terminated for it, in violation of company policy.[3] The defendant argues that the incident never occurred, or, at least, was never proven to

---

[2] The plaintiff actually claims to have suffered racial incidents during the entirety of his 25-year tenure with the defendant, and also claims to have complained about them; however, he cannot recall any specific situations or complaints other than the two at issue here. Plaintiff depo., 206.

[3] Although the defendant acknowledges that it is current company policy to terminate an employee for using the word "nigger" on the job, it qualifies that blanket rule by requiring that the incident be "proven to the satisfaction of the company." Jackson depo., p. 57. In this instance, the defendant argues that the alleged use of the racial slur was not proven to the company's satisfaction.

5

the defendant's satisfaction. The plaintiff admits that he did not personally overhear the statement. He claims that Matthews made the statement to a co-worker, Lori Thomas, who is, herself, black. Plaintiff depo., p. 239-240. The plaintiff also claims that, when Donovan confronted her, she admitted to using the slur. Id. at 239. Donovan, however, does not recall witnessing such an admission. Donovan depo., p. 29.

The other racial incident allegedly occurred between the plaintiff and Robert Jackson, who was the Executive Vice President the year that the plaintiff was supervisor trainee. According to the plaintiff, after he completed the year of training, when he was not given the permanent supervisory job, he went to Jackson to ask for an explanation. The plaintiff claims that Jackson informed him that Jackson had filled "his quota" of black supervisors and did not need to hire more. Although Jackson recalls discussing the current percentages of blacks in supervisory positions, he denies referring to quotas. Jackson depo., p. 46.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment is to be granted if there is no genuine issue of material fact. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. The evidence of the non-moving party is to be believed, and the court is not to attempt to perform jury functions such as credibility determinations. Id. After considering everything in the record, all permissible inferences are to be drawn in favor of the non-moving party. Clinkscales v. Chevron USA, Inc., 831 F.2d 1565, 1570 (11th Cir. 1987).

When the non-moving party has the burden of proof at trial, it must come forward with sufficient evidence on each element that must be proved. Earley v. Champion International Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). If the evidence is merely colorable or is not

significantly probative, summary judgment may be proper. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). Summary judgment is appropriate if on any element there would be insufficient evidence to require submission of the case to a jury. <u>Earley</u>, 907 F.2d at 1080. "The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such circumstances, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).

**ARGUMENT**

The defendant's motion contains two general arguments. The defendant first argues that the plaintiff cannot demonstrate a prima facie case of discrimination or a pretextual excuse with regard to the defendant's decision to make the Sewing Department Supervisor position a training position instead of a permanent supervisory position. The defendant next argues that the plaintiff cannot demonstrate a prima facie case of discrimination or a pretextual excuse with regard to the defendant's decision to not award the permanent supervisory position to the plaintiff at the end of the one-year probationary period.

The plaintiff, in his response to the defendant's summary judgment motion, purports to narrow the issue somewhat. He states, specifically, that "the plaintiff's performance during his tenure as 'trainee' is irrelevant to the present motion. The plaintiff <u>alleges that he should have been awarded a full-fledged position to begin with</u>. The plaintiff's performance after the decision is <u>only relevant to his damages</u>." Plaintiff's Response, p. 9-10 (emphasis added). The

plaintiff appears to limit himself to seeking to prove liability solely on the theory that he should have received a full supervisory position at the outset, not that he should have been given the full supervisory position at the end of the probationary period. The complaint reflects this interpretation of the plaintiff's statements– although the complaint alleges that the plaintiff ultimately was denied the supervisory position because of his "bad health" and alleges that his health did not detract from his job performance, it claims disparate treatment, instead, only through allegations that white employees were promoted to full supervisory positions while the plaintiff was not.

  The defendant argues that there are no disputed material facts in the record. It argues that the plaintiff has set forth no facts to support a prima facie case of discrimination other than his own subjective, conclusory beliefs. It contends that each of the white employees that the plaintiff uses as comparators were not similarly situated with the plaintiff either because of prior work experience in the department in which they were promoted or because of prior significant supervisory experience. The defendant asserts that, assuming *arguendo*, that the plaintiff has made out a prima facie case, its legitimate, nondiscriminatory reason for not offering him a full supervisory position immediately is that the plaintiff, at the time of his probationary promotion, had never before worked in the Sewing Department, and had never worked in a full supervisory capacity at all, even in his own department. The defendant finally argues that the plaintiff cannot prove that this reason is pretextual because the plaintiff has not produced substantial or credible evidence of an underlying discriminatory intent. The defendant notes that, when it determined that the plaintiff was unable to perform satisfactorily as a supervisor, it returned him to his former position instead of simply terminating his employment.

  The plaintiff argues that, because he had served as a team leader in his own department,

8

he met the qualifications for a full promotion. He also argues that he is sufficiently similarly situated to the comparators that he listed, especially Jimmie Williams. The plaintiff notes that Williams had not held a supervisory position before he was given the position of supervisor of the Press department, but, instead, had been a team leader in the Tool and Dye department. However, the defendant promoted Williams without the probationary training period, even after it had made the plaintiff a "Supervisor Trainee," purportedly pursuant to a new company program. See Jackson depo., p. 65. In fact, the plaintiff, thus far, has been the only participant in the program. Id. The plaintiff argues that, since he was a team leader in the Press Department, he was just as qualified to become the supervisor of the Sewing Department, without the probationary training period, as Williams was when he became supervisor of the Press Department. The plaintiff does not provide explicit details as to how he is sufficiently similar to the other comparators that he has listed. The defendant argues that, because the Press Department and the Tool and Dye Department work "hand-in-hand," it was not as much of a stretch for Williams to transfer from team leader in the Tool and Dye Department to supervisor of the Press Department as it was for the plaintiff to transfer from team leader in the Press Department to supervisor of the Sewing Department. The defendant argues that the Press and Sewing departments perform two completely different functions.

  The plaintiff also finds significance in the lack of minorities in the defendant's management positions and "exempt" positions. Currently, the defendant has no racial minorities in management positions at its Piedmont facility, and no black "exempt" employees out of 50 exempt employees. However, the defendant points out, until approximately six months ago, the defendant had a black supervisor and a hispanic supervisor, both of whom were discharged when corporate downsizing eliminated their positions. Jackson depo., 15-16. There was one black

supervisor at the Piedmont facility while the plaintiff was Supervisor Trainee. Id. at 46. The defendant notes that it currently has an asian-american Engineer.

## DISCUSSION

There are three discrete theories pursuant to which a plaintiff can bring an employment discrimination action under Title VII and section 1981: pattern and practice discrimination, disparate treatment, and disparate impact. EEOC v. Joe's Stone Crab, Inc. 220 F.3d 1263, 1274 (11th Cir. 2000). Proof of pattern and practice discrimination and disparate treatment requires proof of discriminatory intent, while proof of disparate impact does not. Id. (citing In Re Employment Litig. Against the State of Alabama, 198 F.3d 1305, 1310 n. 8 (11th Cir.1999)). In order to show discriminatory intent, a plaintiff must demonstrate "'that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group.'" Id. (citing Employment Litig., 198 F.3d at 1321). The plaintiff bears the burden of showing that the employment action at issue, here, awarding the plaintiff a supervisory trainee position instead of a full supervisory position, was taken because of his race. Id.

Pattern and practice discrimination and disparate treatment discrimination are two different causes of action with different burdens of proof. In order to prove pattern and practice discrimination, a plaintiff must show that the alleged discrimination, here, racial discrimination, is the company's "standard operating procedure; the regular rather than the unusual practice." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 336 (1977). A plaintiff seeking to prove a pattern and practice of discrimination must show "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." Id. Because the plaintiff has introduced neither statistical nor anecdotal evidence that indicates that racial discrimination

10

is the defendant's standard operating procedure and usual practice, this court finds that he has not attempted to establish a pattern and practice of discrimination.

The plaintiff, therefore, must rely on his theory of individual disparate treatment.[4] A disparate treatment plaintiff must prove intentional discrimination through either direct or circumstantial evidence. Id. The court notes that the purported direct evidence that the plaintiff has submitted is not so egregious as to constitute direct evidence for purposes of this inquiry. See Carter v. City of Miami, 870 F.2d 578, 581-582 (11th Cir. 1989). It may not even be admissible. Therefore, the plaintiff must show circumstantial evidence of intentional discrimination by demonstrating that: (1) he is a member of a protected class; (2) he was subjected to adverse employment action; (3) his employer treated similarly situated male employees more favorably; and (4) he was qualified to do the job." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir.1999). Once these elements are established, the defendant has the burden of producing "legitimate, non-discriminatory reasons for its employment action." Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir.1997) (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If such a reason is produced, the plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination. See Holifield, 115 F.3d at 1565.

The plaintiff has produced evidence that he is a member of a protected class. He has

---

[4] The plaintiff does not use a specific "failure to hire/promote" theory, presumably because to establish a prima facie case of discrimination based on failure to promote, the plaintiff must demonstrate that: (1) he is a member of the protected class, (2) he applied and was qualified for the position, (3) he was not hired, and (4) the position was awarded to an equally or less qualified employee who was not a member of the protected class. Durley v. APAC, Inc., 236 F.3d 651, 656 (11th Cir. 2000)(emphasis added). The last two prongs of the "failure to promote" prima facie case would be troublesome for the plaintiff because he was given the position– as long as he was supervisor trainee of the Sewing Department, the position was not open, and the defendant neither continued to look for a person to act as supervisor of the Sewing Department, nor awarded the position to someone else.

11

produced evidence that the level of responsibility and prestige of the position that he sought was reduced once it was determined that he was the most qualified candidate for the job. He has produced some evidence, disputed by the defendant, that he was qualified for the full position to begin with, by virtue of his having been a team leader in the Press Department. He has also introduced evidence of a possible comparator, Jimmie Williams, a white employee who was promoted directly from the Tool and Dye department to Supervisor of the Press Department, even though he had only been a team leader in the Tool and Dye department. The plaintiff has produced hotly disputed evidence, completely in the form of his own deposition testimony, that a co-worker who called him a "nigger" went unpunished in violation of company policy, and that the defendant's then-Executive-Vice-President, Robert Jackson, stated that he had hired "his quota" of black supervisors and was not required to hire more.[5] Finally, the plaintiff has introduced evidence that, currently, the defendant has no minority supervisors at its Piedmont facility, although other evidence shows that, at the time of the events at issue, the defendant employed both a black supervisor and a hispanic supervisor.

## CONCLUSION

The court will deny the motion. The issue may be close; however, the court cannot conclude, as a matter of law, that the Williams promotion is not sufficiently comparative.

This 30th day of March, 2001,

*Robert B. Propst*
ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

---

[5] It is not clear what relationship, if any, either of these had to the decision-makers who decided on a trainee approach.

12